# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELSEVIER INC., ELSEVIER B.V., ELSEVIER LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SCI-HUB HUB d/b/a WWW.SCI-HUB.ORG, THE LIBRARY GENESIS PROJECT d/b/a LIBGEN.ORG, ALEXANDRA ELBAKYAN, JOHN DOES 1-99LLC, <br><br> Defendants. | Case No. 15-cv-4282 (RWS) |

**BRIEF OF THE COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION AND THE INTERNET COMMERCE COALITION AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

BRIAN M. WILLEN
Wilson, Sonsini Goodrich & Rosati PC
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Email: bwillen@wsgr.com
Phone: (212) 999-5800
Email: bwillen@wsgr.com

*Counsel for* Amici Curiae

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................ 1

SUMMARY OF ARGUMENT .................................................................................................... 3

I. FRCP 65 DOES NOT ALLOW AN INJUNCTION AGAINST NONPARTY NEUTRAL SERVICE PROVIDERS OR SIMILAR ONLINE SERVICES .................. 3

    A. "Active Concert or Participation" Is Required To Bind A Nonparty ........... 3

    B. *Amici* and Other Service Providers Cannot Be Enjoined Because They Are Not In Active Concert With Defendants ......................................... 4

II. PLAINTIFFS CANNOT CIRCUMVENT THE DMCA BY SEEKING BROAD EX PARTE INJUNCTIVE RELIEF AGAINST SEARCH ENGINES AND SIMILAR SERVICES ...................................................................................... 8

    A. The DMCA Protects Online Service Providers Against Copyright Liability and Strictly Limits The Injunctions That Can Be Imposed ............ 8

    B. Plaintiffs' Requested Injunction Would Be Improper Even If The Neutral Service Providers Were Culpable Defendants ............................... 11

III. PLAINTIFFS CANNOT USE THE ALL WRITS ACT TO BIND NONPARTY SERVICE PROVIDERS ....................................................................................... 12

    A. The All Writs Act Is A Narrow Gap-Filling Provision That Cannot Displace Other Laws And Cannot Be Used To Burden Third Parties ....... 13

    B. The All Writs Act Does Not Authorize An Injunction Here ...................... 14

CONCLUSION ........................................................................................................................... 16

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
  96 F.3d 1390 (Fed. Cir. 1996) ..................................................................................14

*Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930) ...........................................3, 4

*Arista Records LLC v. Tkach*,
  No. 15-cv-3701-AJN, Dkt. 58 (S.D.N.Y. June 3, 2015) ..........................................7

*Blockowicz v. Williams*, 630 F.3d 563 (7th Cir. 2010) .............................................. 6-7

*Bobolas v. Does*, 2010 U.S. Dist. LEXIS 110856 (D. Ariz. Aug. 1, 2010) .................5

*Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431 (1934) ........................................4

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ................................9

*Fla. Medical Ass'n, Inc. v. U. S. Dep't of HEW*, 601 F.2d 199 (5th Cir. 1979) ..........15

*Hansberry v. Lee*, 311 U.S. 32 (1940) ........................................................................3

*In re Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985) ........................................16

*In re United States ex rel. an Order Authorizing Disclosure of Location Info. of a
  Specified Wireless Telephone*, 849 F. Supp. 2d 526 (D. Md. 2011) ....................15

*In re United States for an Order Authorizing the Use of a Pen Register*,
  396 F. Supp. 2d 294 (E.D.N.Y. 2005) ...................................................................14

*ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351 (5th Cir. 1978) ..........................14, 16

*Microsystems Software, Inc. v. Scandinavia Online AB*,
  226 F.3d 35 (1st Cir. 2000) .......................................................................................4

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........................5

*New York v. Operation Rescue Nat'l*, 80 F.3d 64 (2d Cir. 1996) ................................4

*Pa. Bureau of Correction v. United States Marshals Serv.*, 474 U.S. 34 (1985) ..14, 15

*Paramount Pictures Corp. v. Carol Publ'g Grp.*,
  25 F. Supp. 2d 372 (S.D.N.Y. 1998) ....................................................................6, 8

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ....................................... 6, 9

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) ................................................................................ 4

*Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002) ....................................................... 15

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ......................................................................... 1

*United States v. Hall*, 583 F. Supp. 717 (E.D. Va. 1984) ........................................................... 14, 16

*United States v. N.Y. Tel. Co.*, 434 U.S. 159 (1977) ........................................................................ 16

*United States v. Regan*, 858 F.2d 115 (2d Cir. 1988) ......................................................................... 4

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ..................................................... 8, 9

*Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010) ...................................... 13

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012) ................................. 12

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ........................................... 4, 5

**STATUTES, RULES & LEGISLATIVE HISTORY**

17 U.S.C. § 512(c) ....................................................................................................................... 11, 12

17 U.S.C. § 512(d) ....................................................................................................................... 11, 12

17 U.S.C. § 512(j)(1) ......................................................................................................................... 10

17 U.S.C. § 512(j)(2) ......................................................................................................................... 10

17 U.S.C. § 512(j)(3) ..................................................................................................................... 10-11

17 U.S.C. § 512(k)(1) ........................................................................................................................ 12

28 U.S.C. § 1651(a) ........................................................................................................................... 13

Fed. R. Civ. P. 65(d)(2) ................................................................................................................ passim

S. REP. NO. 105-190 (1998) ............................................................................................... 8, 9, 10, 11

**MISCELLANEOUS**

21A Karl Oakes, *Fed. Proc., L. Ed.* § 51:208 (2015 ed.) .................................................................. 12

## INTRODUCTION

Plaintiffs in this case seek an injunction that purports to bind "any Internet search engines, Web Hosting, and Internet Service Providers" (hereafter, Neutral Service Providers) and require them to "cease facilitating access to any or all … websites through which Defendants engage in unlawful access to, use, reproduction, and distribution of Elsevier's copyrighted works." None of these service providers is named as a defendant in this action. Plaintiffs make no showing that these nonparties have violated any legal obligation, much less infringed any of Plaintiffs' copyrights.

What Plaintiffs here are seeking is, in essence, an injunction against the world. It is well established that such a sweeping injunction against nonparty intermediaries is impermissible, overstepping the bounds of Fed. R. Civ. P. 65 and the All Writs Act. Indeed, even if Plaintiffs had named these service providers as defendants and somehow obtained infringement judgments against them, the Digital Millennium Copyright Act (DMCA) would bar the relief that Plaintiffs seek in their proposed injunction. Remedies that Plaintiffs could not obtain after a final judgment against a party should patently not be available in the form of a preliminary injunction against innocent nonparties.

*Amici* represent a wide array of technology companies that provide online services to billions of people, including Neutral Service Providers that might be swept up by Plaintiffs' proposed injunction. *Amici*'s members recognize the importance of combating copyright infringement online, and many of them work closely with rightsholders, including Plaintiffs, against rogue sites that distribute infringing material. But in their zeal to pursue the Defendants here, Plaintiffs ignore the established limits on judicial power and the balance struck by Congress in the DMCA. Those protections cannot be swept aside so readily. Plaintiffs do not need, and should not be allowed, to "[c]ut a great road through the law to get after the Devil." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) (quoting Robert Bolt, *A Man For All Seasons*).

## INTERESTS OF THE AMICI

The **Computer & Communications Industry Association** ("CCIA") represents more than 20 large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services—companies that collectively generate more than $465 billion in annual revenues. A list of CCIA members, including a number of online service providers that could be swept up in Plaintiffs' proposed injunction, is available at https://www.ccianet.org/members.

The **Internet Commerce Coalition** ("ICC") works to promote policies that allow service providers, their customers, and other users to do business on the global Internet under reasonable rules governing liability and use of technology that encourage the growth of this vital medium. The ICC's mission is to encourage a legal environment under which ISPs, customers, and other users can do business on the global Internet under reasonable rules governing liability and use of technology.

*Amici* and their members have a compelling interest in ensuring the rules limiting injunctions against online services are scrupulously followed, particularly in cases where those services are not parties. In this case, Plaintiffs seek an injunction that would directly bind Neutral Service Providers as nonparties, despite their having violated no laws. If the proposed order is granted, these service providers may be compelled to purge or block information—and indeed entire websites and Internet domains—from their services and could face contempt proceedings if they decline. *Amici* submit this brief to explain why such an order would be unlawful and unwise.

There are certainly ample reasons to strike the language from the proposed injunction that targets Neutral Service Providers. Plaintiffs' memorandum of points and authorities, for example, fails to lay any foundation for those provisions of the injunction. Moreover, Plaintiffs have failed to provide proper notice to those it purports to bind with that language. But *amici* urge the Court not only to strike the impermissible

provisions, but also to issue a clear ruling setting out the limits on such injunctions against nonparty intermediaries. Defending against such orders in contempt proceedings is an expensive and poor substitute for preventing their issuance in the first instance. A ruling from the Court in this case making clear that Plaintiffs' proposed injunction goes too far would assist other courts facing similarly overbroad requests for preliminary injunctions or other orders against nonparty service providers.

## ARGUMENT

### I. FRCP 65 Does Not Allow An Injunction Against Nonparty Neutral Service Providers Or Similar Online Services

As nonparties to this case, Neutral Service Providers can be bound by an injunction only insofar as they are working "in active concert or participation" with Defendants. Fed. R. Civ. P. 65(d)(2)(C). This strict standard requires clear evidence that the nonparty is directly working to help the defendant evade an injunction. Plaintiffs do not even try to make that showing. Nor could they.

#### A. "Active Concert or Participation" Is Required To Bind A Nonparty

It is a basic rule of due process that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). As the Second Circuit has explained, a court is "not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832-33 (2d Cir. 1930) (Hand, J.). Thus, the "only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party." *Id.* at 833.

Rule 65 of the Federal Rules of Civil Procedure codifies this "well-established principle that, in exercising its equitable powers, a court 'cannot lawfully enjoin the

world at large.'" *New York v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) (quoting *Alemite Mfg.*, 42 F.2d at 832); *see also, e.g., United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988) ("a court generally may not issue an order against a nonparty"). The Rule mandates that an injunction can bind only a limited universe of people: (1) the parties; (2) their "officers, agents, servants, employees, and attorneys"; or (3) those in "active concert or participation" with them. Fed. R. Civ. P. 65(d)(2); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969) ("a nonparty with notice cannot be held in contempt until shown to be in concert or participation").

The "active concert or participation" standard is deliberately narrow. Its purpose is simply to ensure that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *accord Alemite Mfg.*, 42 F.2d at 833 ("it is not the act described which the decree may forbid, but only that act *when the defendant does it*") (emphasis added). The relationship between the party and the nonparty must be "that of associate or confederate." *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436-37 (1934); *see also Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000) ("active concert" requires a "close alliance with the enjoined defendant"). That ensures that "[a] nonparty who has acted independently of the enjoined defendant will not be bound by the injunction." *Microsystems Software*, 226 F.3d at 43.

      B.    <u>*Amici* and Other Service Providers Cannot Be Enjoined Because They Are Not In Active Concert With Defendants</u>

Plaintiffs' proposed injunction includes some language that incorporates Rule 65's limitations. Dkt. 5, at 5 (¶ 1) (injunction would apply to "the Defendants, their officers, directors, principals, agents, servants, employees, successors and assigns, and all persons and entities in active concert or participation with them"). The provisions of the proposed injunction that apply to Neutral Service Providers, in contrast, pointedly lack any mention of a limitation to those who "act in concert" with or "aid and abet" the

Defendants. *Id*. at 5-6 (¶¶2-6). These provisions sweep far beyond the limits of Rule 65. The Neutral Service Providers are not parties in this action, and Plaintiffs make no showing that any such Providers are in "active concert or participation" with any Defendant.

Plaintiffs offer no evidence that any of these intermediaries have done anything that would satisfy Rule 65(d)(2)(C). The complaint in this case includes no such allegations, and, other than a cursory reference to certain top-level domain registries (Dkt. 6 at 25-26), Plaintiffs have submitted no evidence in support of their motion for a preliminary injunction.[1] In the absence of such evidence—which in order to satisfy due process would have to be presented in a proceeding where those entities were given an opportunity to be heard (*see generally Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950))—the Court cannot enter an order that purports to bind them. *See, e.g.*, *Zenith Radio*, 395 U.S. at 112 ("It was error to enter the injunction against Hazeltine, without having made [the 'active concert or participation'] determination in a proceeding to which Hazeltine was a party."); *Bobolas v. Does*, 2010 U.S. Dist. LEXIS 110856, at *6-7 (D. Ariz. Aug. 1, 2010) ("Plaintiff's counsel argued that GoDaddy is an agent of Defendants given its role as website host and domain name registrar, but Plaintiff has made no such allegation in the complaint and provides no factual or legal proof on this point in its papers. As a result, the Court cannot enter a TRO against GoDaddy.").

Beyond this procedural problem is a more fundamental substantive one. The intermediaries at issue here are not sufficiently connected to Defendants' alleged illegality to be subject to the Court's injunctive power. Consider, for example, the search

---

[1] In light of Plaintiffs' statement that one top-level domain registry (Public Interest Registry) has indicated "that it will comply with a Court order directing it to disable Defendants' domain names" (Dkt. 6 at 25), *amici* take no position as to whether an injunction could or should apply to those services.

engines that are targeted by the proposed injunction. These services catalogue an enormous array of material from all over the Internet in order to return results that they believe are most responsive to their users' search queries. *See generally Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155 (9th Cir. 2007). Even assuming that links to Defendants' websites or other information about their activities are sometimes included in those results, that would not remotely suggest that the search engines are "confederates" of the Defendants, "aiders and abettors," or are working together with them to violate the law. Indeed, search engines provide search results to their billions of users independently of anything Defendants do. Including Defendants' website among the hundreds of millions that a search engine indexes cannot make the search engine a "participant" in Defendants' alleged illegality, any more than a mapmaker can be said to "participate" by including Defendants' physical address on a map. *See, e.g.*, *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372 (S.D.N.Y. 1998) (book retailers not "in active concert" with infringing publisher by selling previously purchased copies of infringing book).

*Blockowicz v. Williams*, 630 F.3d 563 (7th Cir. 2010), is instructive. In that case, the Seventh Circuit held that the operators of a nonparty website (Ripoff Report) could not be bound by an injunction against users of its service who posted defamatory comments about the plaintiffs. The court reached that conclusion even though Ripoff Report had a contractual agreement with the defendants governing their use of the site and even though Ripoff Report continued to provide service to the defendants by leaving their material up on its website after the injunction issued. *Id.* at 567-68. The court explained that Ripoff Report's actions simply did not amount to "active concert or participation" under Rule 65. *Id.* at 569-70 ("Rule 65(d)(2)(C) is not broad enough to bind [the website operators] to the terms of this injunction in light of their inactivity.").

The Neutral Service Providers here are several steps further removed from Defendants than Ripoff Report was from its users in *Blockowicz*. Plaintiffs have failed to

make a showing that *any* such provider had a contract with these Defendant or any direct contact with their activities—much less that *all* of the providers who would be swept up by the proposed injunction had such a connection. The mere fact that one or more of the Neutral Service Providers might have the capacity to impede access to Defendants' websites is not enough. As a matter of law, the fact that a service provider "is technologically capable of removing the postings does not render its failure to do so aiding and abetting." *Id*. at 568. "Rule 65 (d)(2)(C) is not the appropriate mechanism for achieving the removal of the defendants' posts." *Id*. at 569.[2]

\* \* \*

An injunction cannot apply to "independent action taken by nonparties on their own behalf." *Carol Publ'g*, 25 F. Supp. 2d at 375. That is the situation here. Under Rule 65, *amici* and other online services operating independently from Defendants—not as their confederates in a scheme to frustrate the Court's orders—must be excluded from any injunction in this case.

---

[2] In a recent decision, Judge Nathan held an injunction against an infringing website could apply to CloudFlare—a nonparty service provider that contracted with the defendants to translate their websites' domain names into IP addresses and to provide optimization services to those sites. *Arista Records LLC v. Tkach*, No. 15-cv-3701-AJN, Dkt. 58 (S.D.N.Y. June 3, 2015). While *amici* respectfully disagree with Judge Nathan's ruling, it is readily distinguishable from this case. The key point emphasized in *Tkach* was that CloudFlare entered into an agreement to start providing services to the Defendants only *after* it had received notice of the injunction. *Id*. at 8. Moreover, the court suggested that CloudFlare did not just provide passive hosting, but actively serviced defendants' websites by ensuring that their IP addresses remained linked to their domain names and by optimizing their performance for faster load times. *Id*. Even assuming these considerations are meaningful, they only confirm that an injunction against Neutral Service Providers and similar providers would not be appropriate here. As explained, unlike CloudFlare there is no evidence of any relationship between Defendants and any Neutral Service Provider. Thus, even under *Tkach's* logic, continuing to operate their services as they were prior to an injunction would not amount to "active concert."

## II. Plaintiffs Cannot Circumvent The DMCA By Seeking Broad Ex Parte Injunctive Relief Against Search Engines And Similar Services

Plaintiffs' bid for a sweeping injunction against nonparty intermediaries runs headlong into another obstacle: the DMCA safe harbors. The DMCA imposes strict limits on the injunctions that can be issued against online service providers—*even after they have been found liable for copyright infringement*. And even in that circumstance, the statute categorically prohibits the relief that Plaintiffs seek here. The DMCA expresses Congress's intent that concerns about infringement on the Internet be resolved through voluntary cooperation between service providers and copyright owners, not by broad court orders issued without notice. It cannot be that a remedy prohibited even after a finding of copyright liability against a party could be available via a preliminary injunction against the same entity in the role of a nonparty accused of violating no law.

### A. The DMCA Protects Online Service Providers Against Copyright Liability and Strictly Limits The Injunctions That Can Be Imposed

The DMCA was enacted in 1998 to "update domestic copyright law for the digital age." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26-27 (2d Cir. 2012). A key part of that project was to "clarify the liability faced by service providers who transmit potentially infringing material over their networks.'" *Id.* at 27 (quoting S. REP. NO. 105-190, at 2 (1998)). Congress recognized that "in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." S. REP. NO. 105-190, at 8. By limiting providers' "legal exposure for infringements that may occur in the course of their activities" (*Amazon*, 508 F.3d at 1158), the "DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." S. REP. NO. 105-190, at 8.

To that end, Congress created a series of "safe harbors for certain common activities of service providers." *Id.* at 19. The safe harbors "allow qualifying service

providers to limit their liability for claims of copyright infringement based on (a) 'transitory digital network communications,' (b) 'system caching,' (c) 'information residing on systems or networks at [the] direction of users,' and (d) 'information location tools.'" *Viacom*, 676 F.3d at 27 (quoting 17 U.S.C. § 512(a)-(d)). The DMCA safe harbors offer far-reaching protection: "A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j)." *Amazon*, 508 F.3d at 1158; *see also* S. REP. NO. 105-190, at 52-53 (section 512(j) expressly "limits the scope of injunctive relief that may be ordered against a qualifying provider").

This means that *even if a qualifying online service provider is found liable for infringement*, the only remedies available to the plaintiff are those permitted by the DMCA. S. REP. NO. 105-190, at 40 (explaining that the DMCA's "limitations on liability apply if the provider is found to be liable under existing principles of law"). A service provider does not need a safe harbor from remedies if it has not violated the law — in that case, no remedies would be available at all. The DMCA thus puts bedrock limits on the injunctions that can be imposed on qualifying providers (such as the Neutral Service Providers here) if they are named as defendants and are held liable as infringers. *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("Congress intended the DMCA's safe harbor for ISPs to be a floor, not a ceiling, of protection.").[3] Plaintiffs here ignore that. What they seek, in the posture of a preliminary injunction against nonparties, goes beyond what Congress was willing to permit, even against service

---

[3] Likewise, the DMCA's provisions limiting injunctive relief supplement the ordinary rules governing injunctions. *See* S. REP. NO. 105-190, at 52 (section 512(j) "defines the terms and conditions under which an injunction may be issued against a service provider" that is "otherwise subject to an injunction under existing principles of law"). They thus provide an additional set of procedural and substantive protections to service providers beyond, for example, the limits imposed by Fed. R. Civ. P. 65.

providers who come before a court as defendants against whom an actual judgment of infringement has been entered. That request must be rejected.

The DMCA provides that a "court may grant injunctive relief with respect to a service provider *only* in one or more" of the forms set out in the statute. 17 U.S.C. § 512(j)(1) (emphasis added). That ensures that any injunction issued against a service provider covered by the Section 512(b), (c), or (d) safe harbors focuses narrowly on "material or activity residing at a particular online site" (§512(j)(1)(A)(i)), and is the "least burdensome to the service provider among the forms of relief comparably effective for that purpose" (§512(j)(1)(A)(iii)). For providers covered by Section 512(a), which include those who transmit material over the Internet or provide connections to websites, Congress imposed even more stringent limits. §512(j)(1)(B). Any order directed at such providers in a case involving a foreign website must specify "reasonable steps" for the provider to take to block access "to a *specific*, *identified*, online location outside the United States." §512(j)(1)(B)(ii) (emphasis added).

In order to further protect the interests and operations of service providers, Section 512(j)(2) "identifies factors a court *must consider* in deciding whether to grant injunctive relief and in determining the appropriate scope of injunctive relief." S. REP. NO. 105-190, at 53 (emphasis added). Those include:

- "whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network" (§512(j)(2)(A));

- "whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available" (§512(j)(2)(D)).

Beyond all that, subsection (j) includes a vital procedural protection: "injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided." §512(j)(3). This provision

"prohibits most forms of ex parte injunctive relief (including temporary and preliminary relief) against a service provider qualifying for a liability limitation under section 512." S. REP. NO. 105-190, at 53.

> B. Plaintiffs' Requested Injunction Would Be Improper Even If The Neutral Service Providers Were Culpable Defendants

The Neutral Service Providers targeted by Plaintiffs' proposed injunction are all "service providers" that qualify for the protections of the DMCA safe harbors. 17 U.S.C. § 512(k)(1); *accord Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) ("The DMCA's definition of 'service provider' is intended to encompass a broad set of Internet entities."). They perform various functions covered by the safe harbors. Search engines provide "information location tools" that are protected by the Section 512(d) safe harbor. S. REP. NO. 105-190, at 47 ("The term information location tools includes, for example: a directory or index of online sites or material such as a search engine that identifies pages by specified criteria…."). "Web Hosting and Internet Service Providers" store material uploaded by users (covered by the Section 512(c) safe harbor) and/or transmit information across their networks (covered by the Section 512(a) safe harbor). *See id.* at 43 (examples of online "storage" covered by 512(c) include "providing server space for a user's web site"); *id.* at 41 (Section 512(a) applies to "communications functions associated with sending digital communications of others across digital networks, such as the Internet and other online networks").

Accordingly, if the Neutral Service Providers had been named as defendants—and had been found liable for copyright infringement for linking to, hosting, or transmitting infringing material from Defendants' websites—any injunction issued against those service providers would be subject to the requirements of 17 U.S.C. § 512(j). But Plaintiffs here have not named any Neutral Service Provider as a defendant. They have come forward with no allegations or evidence suggesting that any Neutral Service Provider is secondarily liable for any copyright infringements

occurring on the Defendants' websites. Nevertheless, Plaintiffs now seek a preliminary injunction that purports to bind "any" Neutral Service Provider as a nonparty upon after-the-fact notice of the injunction. That is not permissible. Copyright plaintiffs cannot obtain injunctions against online service providers *as nonparties* that would have been barred by the DMCA against those same service providers had they been adjudicated as *culpable defendants.* In their zeal to go after Defendants in this case, the Plaintiffs here seek just such a logic-defying result—one that would do unacceptable violence to the balanced statutory scheme set out by Congress in the DMCA.[4]

### III. Plaintiffs Cannot Use The All Writs Act To Bind Nonparty Service Providers

Plaintiffs also cannot justify their request for an order binding nonparty service providers using the All Writs Act. Dkt. 6 at 24-26. The All Writs Act is a narrow gap-filling provision. It is "reserved for really extraordinary causes, such as a clear abuse of discretion or usurpation of judicial power." 21A Karl Oakes, *Fed. Proc., L. Ed.* § 51:208 (2015 ed.) (footnotes omitted). The Act does not apply here.

---

[4] Respecting the DMCA does not leave Plaintiffs without recourse. Not only might they get an injunction against Defendants themselves, Plaintiffs can use the DMCA's notice-and-takedown regime to alert service providers to Defendants' allegedly infringing material. The statute creates a streamlined, non-judicial process for removing suspected infringing material from online services and search engines. Copyright owners provide service providers with specified information (under penalty of perjury) about particular infringing material on their systems (§512(c)(3)) or search results (§512(d)(3)). In response, the service provider will "expeditiously" remove the identified material. §§ 512(c)(1)(C), 512(d)(3). The "DMCA notification regime works efficiently," *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010), *aff'd in part & vacated in part*, 676 F.3d 19 (2d Cir. 2012), giving clarity to service providers and copyright owners while setting the stage for voluntary cooperation between them. By putting this process at the heart of the DMCA, Congress indicated its preference that service providers and copyright owners work together outside the formal legal process.

### A. The All Writs Act Is A Narrow Gap-Filling Provision That Cannot Displace Other Laws And Cannot Be Used To Burden Third Parties

Enacted in 1789, the All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). It is designed to fill "the interstices of federal judicial power when those gaps threatened to thwart the otherwise proper exercise of federal courts' jurisdiction." *Pa. Bureau of Correction v. United States Marshals Serv.*, 474 U.S. 34, 41 (1985). Although the All Writs Act is flexible, there are several important limitations on how and when it can be applied.

*First*, any order issued under the Act must aim narrowly at protecting *the court's* jurisdiction. "The Supreme Court has been careful to limit the All Writs Act to cases in which the requested relief is necessary to give effect to an order that the court is authorized to grant, *i.e.,* to cases in which the court could not otherwise discharge its assigned duties." *Additive Controls & Measurement Sys, Inc.. v. Flowdata, Inc.*, 96 F.3d 1390, 1396 (Fed. Cir. 1996); *see also, e.g.*, *ITT Cmt'y Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) ("conduct not shown to be detrimental to the court's jurisdiction or exercise thereof could not have been enjoined under the Act"). Without a clear nexus to a court's authority to exercise its jurisdiction, the fact that a *party* may be aided in enforcing its rights by an order is not sufficient. The All Writs Act is not "a mechanism for the judiciary to give [a party] the investigative tools that Congress has not." *In re United States for an Order Authorizing the Use of a Pen Register*, 396 F. Supp. 2d 294, 325 (E.D.N.Y. 2005).

*Second*, while there is no *per se* rule against using the Act to bind a third party, "the assistance of the third party must be absolutely necessary." *United States v. Hall*, 583 F. Supp. 717, 719 (E.D. Va. 1984):

> [T]he extraordinary remedy of enjoining non-parties must be reserved for extraordinary cases, in which the activities of third parties threaten to undermine the court's ability to render a binding judgment in the case

-13-

before it. Nothing … suggests that the All Writs Act can be employed as a general license for district courts to grant relief against non-parties whenever such measures seem useful or efficient.

*Additive Controls*, 96 F.3d at 1396.

*Third*, the Act does not allow courts "to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pa. Bureau*, 474 U.S. at 43. Thus, where "a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Id.*; *see, e.g.*, *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002) (holding that the Act may not be used to remove cases from state court where that is not authorized by the statute specifically governing removal). Nor can the Act override constitutional protections. *In re United States ex rel. an Order Authorizing Disclosure of Location Info. of a Specified Wireless Telephone*, 849 F. Supp. 2d 526, 581-83 (D. Md. 2011) ("The government simply cannot use the All Writs Act to circumvent the requirements of the Fourth Amendment…").

B. The All Writs Act Does Not Authorize An Injunction Here

Plaintiffs' invocation of the All Writs Act here transgresses these limits. Most obviously, the Act does not permit Plaintiffs to circumvent Rule 65 and the DMCA. "While the All Writs Act empowers a district court to fashion extraordinary remedies when the need arises, it does not authorize a district court to promulgate an ad hoc procedural code whenever compliance with the Rules proves inconvenient." *Fla. Medical Ass'n, Inc. v. U. S. Dep't of HEW*, 601 F.2d 199, 202 (5th Cir. 1979) ("the All Writs Act does not free a district court from the restraints of Rule 65"). For a court to impose injunctive relief that is specifically forbidden by the Rules of Civil Procedure and the federal copyright laws would exceed the limited role of the All Writs Act. Just as parties "may not, by resorting to the All Writs Act, avoid complying with the statutory requirements for removal" (*Syngenta*, 537 U.S. at 32-33), rightsholders may not invoke

the Act as an end-run around the statutory requirements for obtaining injunctions against online service providers.

Moreover, an order binding the Neutral Service Providers is not necessary to protect the court's jurisdiction. While the All Writs Act can be used to prevent third parties from "frustrat[ing] the implementation of a court order" (*United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977)), that is not broad license to issue third-party writs whenever it might assist a party in obtaining relief. Such orders must be tailored to "preserve the court's ability to reach or enforce its decision" as against "non-parties whose actions would impair the court's jurisdiction." *In re Baldwin-United Corp.*, 770 F.2d 328, 338-39 (2d Cir. 1985). That's not the case here. Requiring search engines to delete references to Defendants' websites, for example, would not "curb conduct which threaten[s] improperly to impede or defeat the subject matter jurisdiction then being exercised by the court." *Barton*, 569 F.2d at 1359. Nor would an order requiring ISPs to block their subscribers from accessing Defendants' websites be needed to protect this Court's subject matter jurisdiction. Even if such an order helped Plaintiffs enforce their copyrights, "'[t]he fact that a party may be better able to effectuate its rights or duties if a writ is issued never has been, and under the language of the statute cannot be, a sufficient basis for issuance of the writ.'" *Id.* at 1360 (quoting *N.Y. Tel.*, 434 U.S. at 189 (Stevens, J., dissenting)).

Finally, the assistance of service providers is not "absolutely necessary" to effectuate any injunction the Court might issue. *Hall*, 583 F. Supp. at 719. In approving a third-party writ in *New York Telephone*, the Supreme Court emphasized "that without the Company's assistance there is no conceivable way in which the surveillance authorized by the District Court could have been successfully accomplished." 434 U.S. at 175. That is not the case here. An injunction against the Defendants alone would be fully enforceable. There is no reason to think that such an order would fail unless the Court goes further and imposes requirements directly on Neutral Service Providers.

## CONCLUSION

For these reasons, *amici* ask the Court to strike Paragraphs 2 and 6 from Plaintiffs' proposed preliminary injunction, and to issue an order that would provide guidance to future courts faced with improper requests for injunctions against nonparty Internet intermediaries. In particular, the Court should make clear that Neutral Service Providers are not "in active concert and participation" with Defendants and that the DMCA does not allow, and the All Writ Act does not authorize, an injunction against such providers in circumstances such as these.

Dated: June 26 2015                    Respectfully submitted,

s/ *Brian M. Willen*
BRIAN M. WILLEN
Wilson, Sonsini Goodrich & Rosati PC
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Email: bwillen@wsgr.com
Phone: (212) 999-5800
Email: bwillen@wsgr.com

*Counsel for* Amici Curiae

-16-