```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X

ELSEVIER INC., ELSEVIER B.V., and
ELSEVIER LTD.,

                    Plaintiffs,
                                              15 Civ. 4282(RWS)
     - against -
                                                   OPINION

WWW.SCI-HUB.ORG, THE LIBRARY GENESIS
PROJECT, d/b/a LIBGEN.ORG, ALEXANDRA
ELBAKYAN, and JOHN DOES 1-99,

                    Defendants.

------------------------------------------X


A P P E A R A N C E S

        Attorneys for the Plaintiffs

        DEVORE & DEMARCO LLP
        99 Park Avenue, Suite 1100
        New York, NY 10016
        By:  Joseph DeMarco, Esq.
             David Hirschberg, Esq.
             Urvashi Sen, Esq.

        Pro Se

        Alexandra Elbakyan
        Almaty, Kazakhstan
```



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/30/15

1

**Sweet, D.J.,**

Plaintiffs Elsevier Inc., Elsevier B.V., and Elsevier, Ltd. (collectively, "Elsevier" or the "Plaintiffs") have moved for a preliminary injunction preventing defendants Sci-Hub, the Library Genesis Project (the "Project"), Alexandra Elbakyan ("Elbakyan"), Bookfi.org, Elibgen.org, Erestroresollege.org, and Libgen.info (collectively, the "Defendants") from distributing works to which Elsevier owns the copyright. Based upon the facts and conclusions below, the motion is granted and the Defendants are prohibited from distributing the Plaintiffs' copyrighted works.

## Prior Proceedings

Elsevier, a major publisher of scientific journal articles and book chapters, brought this action on June 2, 2015, alleging that the Defendants, a series of websites affiliated with the Project (the "Website Defendants") and their owner and operator, Alexandra Elbakyan, infringed Elsevier's copyrighted works and violated the Computer Fraud and Abuse Act. (See generally Complaint, Dkt. No. 1.) Elsevier filed the instant motion for a preliminary injunction on June 11, 2015, via an Order to Show Cause. (Dkt. Nos. 5-13.) On June 18, 2015, the Court granted

2

Plaintiffs' Order to Show Cause and authorized service on the Defendants via email. (Dkt. No. 15.) During the following week, the Plaintiffs served the Website Defendants via email and Elbakyan via email and postal mail. (See Dkt. Nos. 24-31.)

On July 7, 2015, the Honorable Ronnie Abrams, acting as Part One Judge, held a telephone conference with the Plaintiffs and Elbakyan, during which Elbakyan acknowledged receiving the papers concerning this case and declared that she did not intend to obtain a lawyer. (See Transcript, Dkt. No. 38.) After the conference, Judge Abrams issued an Order directing Elbakyan to notify the Court whether she wished assistance in obtaining pro bono counsel, and advising her that while she could proceed pro se, the Website Defendants, not being natural persons, must obtain counsel or risk default. (Dkt. No. 36.) A second telephonic conference was held on July 14, 2015, during which Elbakyan stated that she needed additional time to find a lawyer. (See Transcript, Dkt. No. 42.) Judge Abrams granted the request, but warned Elbakyan that "you have to move quickly both in attempting to retain an attorney and you'll have to stick to the schedule that is set once it's set." (Id. at 6.) After the telephone conference, Judge Abrams issued another Order setting the preliminary injunction hearing for September 16 and directing Elbakyan to inform the Court by July 21 if she wished assistance in obtaining pro bono counsel. (Dkt. No. 40.)

3

The motion for a preliminary injunction was heard on September 16, 2015. None of the Defendants appeared at the hearing, although Elbakyan sent a two-page letter to the court the day before. (Dkt. No. 50.)

**Applicable Standard**

Preliminary injunctions are "extraordinary and drastic remed[ies] that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). In a copyright case, a district court may, at its discretion, grant a preliminary injunction when the plaintiffs demonstrate 1) a likelihood of success on the merits, 2) irreparable harm in the absence of an injunction, 3) a balance of the hardships tipping in their favor, and 4) that issuance of an injunction would not do a disservice to the public interest. WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 278 (2d Cir. 2012).

**The Motion is Granted**

With the exception of Elbakyan, none of the Defendants filed any opposition to the instant motion, participated in any hearing or telephone conference, or in any other way appeared in

4

the case. Although Elbakyan acknowledges that she is the "main operator of sci-hub.org website" (Dkt. No. 50 at 1.), she may only represent herself *pro se*; since the Website Defendants are not natural persons, they may only be represented by an attorney admitted to practice in federal court. See Max Cash Media, Inc. v. Prism Corp., No. 12 Civ. 147, 2012 WL 2861162, at *1 (S.D.N.Y. July 9, 2012); Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983) (stating reasons for the rule and noting that it is "venerable and widespread"). Because the Website Defendants did not retain an attorney to defend this action, they are in default.

However, the Website Defendants' default does not automatically entitle the Plaintiffs to an injunction, nor does the fact that Elbakyan's submission raises no merits-based challenge to the Plaintiffs' claims. See Thurman v. Bun Bun Music, No. 13 Civ. 5194, 2015 WL 2168134, at *4 (S.D.N.Y. May 7, 2015). Instead, notwithstanding the default, the Plaintiffs must present evidence sufficient to establish that they are entitled to injunctive relief. See id.; Gucci Am., Inc. v. Curveal Fashion, No. 09 Civ. 8458, 2010 WL 308303, at *2 (S.D.N.Y. Jan 20, 2010); CFTC v. Vartuli, 228 F.3d 94, 98 (2d Cir. 2000).

A. Likelihood of Success on the Merits

5

Elsevier has established that the Defendants have reproduced and distributed its copyrighted works, in violation of the exclusive rights established by 17 U.S.C. § 106. (See Complaint, Dkt. No. 1, at 11-13.) In order to prevail on a claim for infringement of copyright, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).

Elsevier has made a substantial evidentiary showing, documenting the manner in which the Defendants access its ScienceDirect database of scientific literature and post copyrighted material on their own websites free of charge. According to Elsevier, the Defendants gain access to ScienceDirect by using credentials fraudulently obtained from educational institutions, including educational institutions located in the Southern District of New York, which are granted legitimate access to ScienceDirect. (See Declaration of Anthony Woltermann (the "Woltermann Dec."), Dkt. No. 8, at 13-14.) As an attachment to one of the supporting declarations to this motion, Elsevier includes a sequence of screenshots showing how a user could go to www.sci-hub.org, one of the Website

6

Defendants, search for information on a scientific article, get a set of search results, click on a link, and be redirected to a copyrighted article on ScienceDirect, via a proxy. (See Wolterman Dec. at 41-44 and Ex. U.) Elsevier also points to a Twitter post (in Russian) indicating that whenever an article is downloaded via this method, the Defendants save a copy on their own servers. (See Declaration of David M. Hirschberg, Dkt. No. 12, Ex. B.) As specific examples, Elsevier includes copies of two of its articles accessed via the Defendants' websites, along with their copyright registrations. (Declaration of Paul F. Doda, Dkt. No. 9, Exs. B-D.) This showing demonstrates a likelihood of success on Elsevier's copyright infringement claims.

Elsevier also shows a likelihood of success on its claim under the Computer Fraud and Abuse Act ("CFAA"). The CFAA prohibits, inter alia, obtaining information from "any protected computer" without authorization, 18 U.S.C. § 1030(a)(2)(C), and obtaining anything of value by accessing any protected computer with intent to defraud. Id. § (a)(4). The definition of "protected computer" includes one "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." Id. § (e)(2)(B); Nexans

7

Wires S.A. v. Sark-USA, Inc., 166 F. App'x 559, 562 n.5 (2d Cir. 2006). Elsevier's ScienceDirect database is located on multiple servers throughout the world and is accessed by educational institutions and their students, and qualifies as a computer used in interstate commerce, and therefore as a protected computer under the CFAA. (See Woltermann Dec. at 2-3.) As found above, Elsevier has shown that the Defendants' access to ScienceDirect was unauthorized and accomplished via fraudulent university credentials. While the CFAA requires a civil plaintiff to have suffered over $5,000 in damage or loss, see Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 439 (2d Cir. 2004), Elsevier has made the necessary showing since it documented between 2,000 and 8,500 of its articles being added to the LibGen database each day (Woltermann Dec. at 8, Exs. G & H) and because its articles carry purchase prices of between $19.95 and $41.95 each. Id. at 2; see Millennium TGA, Inc. v. Leon, No. 12 Civ. 1360, 2013 WL 5719079, at *10 (E.D.N.Y. Oct. 18, 2013).[1]

Elsevier's evidence is also buttressed by Elbakyan's submission, in which she frankly admits to copyright infringement. (See Dkt. No. 50.) She discusses her time as a

---

[1] While Elsevier's articles are likely sufficient on their own to qualify as "[]thing[s] of value" under the CFAA, Elbakyan acknowledges in her submission that the Defendants derive revenue from their website. (See Letter, Dkt. No. 50, at 1 ("That is true that website collects donations, however we do not pressure anyone to send them.").)

8

student at a university in Kazakhstan, where she did not have access to research papers and found the prices charged to be "just insane." (Id. at 1.) She obtained the papers she needed "by pirating them," and found may similar students and researchers, predominantly in developing countries, who were in similar situations and helped each other illicitly obtain research materials that they could not access legitimately or afford on the open market. (Id.) As Elbakyan describes it, "I could obtain any paper by pirating it, so I solved many requests and people always were very grateful for my help. After that, I created sci-hub.org website that simply makes this process automatic and the website immediately became popular." (Id.)

Given Elsevier's strong evidentiary showing and Elbakyan's admissions, the first prong of the preliminary injunction test is firmly established.

B. Irreparable Harm

Irreparable harm is present "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999). Here, there is irreparable harm because it is entirely likely that the

9

damage to Elsevier could not be effectively quantified. Register.com, 356 F.3d at 404 ("irreparable harm may be found where damages are difficult to establish and measure."). It would be difficult, if not impossible, to determine how much money the Plaintiffs have lost due to the availability of thousands of their articles on the Defendant websites; some percentage of those articles would no doubt have been paid for legitimately if they were not downloadable for free, but there appears to be no way of determining how many that would be. There is also the matter of harm caused by "viral infringement," where Elsevier's content could be transmitted and retransmitted by third parties who acquired it from the Defendants even after the Defendants' websites were shut down. See WPIX, Inc. v. ivi, Inc., 765 F. Supp. 2d 594, 620 (S.D.N.Y. 2011), aff'd 691 F.3d 275 (2d Cir. 2012). "[C]ourts have tended to issue injunctions in this context because 'to prove the loss of sales due to infringement is . . . notoriously difficult.'" Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010) (quoting Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190, 1195 (2d Cir. 1971) (Friendly, J.)).

Additionally, the harm done to the Plaintiffs is likely irreparable because the scale of any money damages would dramatically exceed Defendants' ability to pay. Brenntag, 175 F.3d at 249-50 (explaining that even where money damages can be

10

quantified, there is irreparable harm when a defendant will be unable to cover the damages). It is highly likely that the Defendants' activities will be found to be willful - Elbakyan herself refers to the websites' activities as "pirating" (Dkt. No. 50 at 1) - in which case they would be liable for between $750 and $150,000 in statutory damages for each pirated work. See 17 U.S.C. § 504(c); HarperCollins Publishers LLC v. Open Road Integrated Media, LLP, 58 F. Supp. 3d 380, 387 (S.D.N.Y. 2014). Since the Plaintiffs credibly allege that the Defendants infringe an average of over 3,000 new articles each day (Woltermann Decl. at 7), even if the Court were to award damages at the lower end of the statutory range the Defendants' liability could be extensive. Since the Defendants are an individual and a set of websites supported by voluntary donations, the potential damages are likely to be far beyond the Defendants' ability to pay.

C. Balance of Hardships

The balance of hardships clearly tips in favor of the Plaintiffs. Elsevier has shown that it is likely to succeed on the merits, and that it continues to suffer irreparable harm due to the Defendants' making its copyrighted material available for free. As for the Defendants, "it is axiomatic that an infringer

11

of copyright cannot complain about the loss of ability to offer its infringing product." WPIX, 691 F.3d at 287 (quotation omitted). The Defendants cannot be legally harmed by the fact that they cannot continue to steal the Plaintiff's content, even if they tried to do so for public-spirited reasons. See id.

D. Public Interest

To the extent that Elbakyan mounts a legal challenge to the motion for a preliminary injunction, it is on the public interest prong of the test. In her letter to the Court, she notes that there are "lots of researchers . . . especially in developing countries" who do not have access to key scientific papers owned by Elsevier and similar organizations, and who cannot afford to pay the high fees that Elsevier charges. (Dkt. No. 50, at 1.) Elbakyan states in her letter that Elsevier "operates by racket: if you do not send money, you will not read any papers. On my website, any person can read as many papers as they want for free, and sending donations is their free will. Why Elsevier cannot work like this, I wonder?" (Id.) Elbakyan also notes that researchers do not actually receive money in exchange for granting Elsevier a copyright. (Id.) Rather, she alleges they give Elsevier ownership of their works "because Elsevier is an owner of so-called 'high-impact' journals. If a

12

researcher wants to be recognized, make a career - he or she needs to have publications in such journals." (Id. at 1-2.) Elbakyan notes that prominent researchers have made attempts to boycott Elsevier and states that "[t]he general opinion in research community is that research papers should be distributed for free (open access), not sold. And practices of such companies like Elsevier are unacceptable, because they limit distribution of knowledge." (Id. at 2.)

Elsevier contends that the public interest favors the issuance of an injunction because doing so will "protect the delicate ecosystem which supports scientific research worldwide." (Pl.'s Br., Dkt. No. 6, at 21.) It states that the money it generates by selling access to scientific research is used to support new discoveries, to create new journals, and to maintain a "definitive and accurate record of scientific discovery." (Id.) It also argues that allowing its articles to be widely distributed risks the spread of bad science - while Elsevier corrects and retracts articles whose conclusions are later found to be flawed, it has no way of doing so when the content is taken out of its control. (Id. at 22.) Lastly, Elsevier argues that injunctive relief against the Defendants is important to deter "cyber-crime," while failing to issue an injunction will incentivize pirates to continue to publish copyrighted works.

13

It cannot be denied that there is a compelling public interest in fostering scientific achievement, and that ensuring broad access to scientific research is an important component of that effort. As the Second Circuit has noted, "[c]opyright law inherently balances [] two competing public interests . . . the rights of users and the public interest in broad accessibility of creative works, and the rights of copyright owners and the public interest in rewarding and incentivizing creative efforts (the 'owner-user balance')." WPIX, 691 F.3d at 287. Elbakyan's solution to the problems she identifies, simply making copyrighted content available for free via a foreign website, disserves the public interest. As the Plaintiffs have established, there is a "delicate ecosystem which supports scientific research worldwide," (Pl.'s Br., Dkt. No. 6 at 21), and copyright law pays a critical function within that system. "Inadequate protections for copyright owners can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." WPIX, 691 F.3d at 287. The existence of Elsevier shows that publication of scientific research generates substantial economic value.

The public's interest in the broad diffusion of scientific knowledge is sustained by two critical exceptions in copyright

14

law. First, the "idea/expression dichotomy" ensures that while a scientific article may be subject to copyright, the ideas and insights within that article are not. See 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery"). "Due to this distinction, every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication." Eldred v. Ashcroft, 537 U.S. 186, 219 (2003). So while Elsevier may be able to keep its actual articles behind a paywall, the discoveries within them are fair game for anyone. Secondly, the "fair use" doctrine, codified at 17 U.S.C. § 107, allows the public to use expressions, as well as ideas, "for purposes such as criticism, comment, news reporting, *teaching . . . scholarship, or research*" without being liable for copyright infringement. (emphasis added) Under this doctrine, Elsevier's articles themselves may be taken and used, but only for legitimate purposes, and not for wholesale infringement. See Eldred, 537 U.S. at 219.[2] The public interest in the broad dissemination and use of scientific research is protected by the idea/expression dichotomy and the fair use doctrine. See Golan v. Holder, 132

---

[2] The public interest in wide dissemination of scientific works is also served by the fact that copyrights are given only limited duration. See Sony Corp. of Am. V. Universal City Studios, Inc., 464 U.S. 417, 431-32 (1984).

15

S. Ct. 873, 890 (2012); Eldred, 537 U.S. at 219. Given the importance of scientific research and the critical role that copyright plays in promoting it, the public interest weighs in favor of an injunction.

**Conclusion**

For the reasons set forth above, the motion for a preliminary injunction is granted. It is hereby ordered that:

1. The Defendants, their officers, directors, principals, agents, servants, employees, successors and assigns, and all persons and entities in active concert or participation with them, are hereby temporarily restrained from unlawful access to, use, reproduction, and/or distribution of Elsevier's copyrighted works and from assisting, aiding, or abetting any other person or business entity in engaging in unlawful access to, use, reproduction, and/or distribution of Elsevier's copyrighted works.
2. Upon the Plaintiffs' request, those organizations which have registered Defendants' domain names on behalf of Defendants shall disclose immediately to the Plaintiffs all information in their possession concerning the identity of the operator or registrant of such domain names and of any

16

bank accounts or financial accounts owned or used by such operator or registrant.

3. Defendants shall not transfer ownership of the Defendants' websites during the pendency of this Action, or until further Order of the Court.

4. The TLD Registries for the Defendants' websites, or their administrators, shall place the domain names on registryHold/serverHold as well as serverUpdate, serverDelete, and serverTransfer prohibited statuses, until further Order of the Court.

5. The Defendants shall preserve copies of all computer files relating to the use of the websites and shall take all necessary steps to retrieve computer files relating to the use of the websites that may have been deleted before entry of this Order.

6. That security in the amount of $5,000 be posted by the Plaintiffs within one week of the entry of this Order. See Fed. R. Civ. P. 65(c).

It is so ordered.

New York, NY
October 28, 2015

ROBERT W. SWEET
U.S.D.J.

18